# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

RAMONA MATOS RODRIGUEZ, ET AL.,

*Plaintiffs-Appellees*,

*v.*

PAN AMERICAN HEALTH ORGANIZATION,

*Putative Defendant-Appellant*,

JOAQUIN MOLINA, ALBERTO KLEIMAN, DOES 1-10,

*Defendants*.

On Appeal from the United States District Court
for the District of Columbia, No. 1:20-cv-00928
Before the Honorable James E. Boasberg

**OPENING BRIEF FOR
THE PAN AMERICAN HEALTH ORGANIZATION**

David W. Bowker
Daniel S. Volchok
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
david.bowker@wilmerhale.com

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel of record certifies as follows:

**A.  Parties And Amici**

Plaintiffs-appellees Ramona Matos Rodriguez, Tatiana Carballo Gomez, Fidel Cruz Hernandez, and Russela Margarita Rivero Sarabia appeared in the district court (on behalf of a putative class of individuals similarly situated) and are parties in this Court.

Putative defendant-appellant the Pan American Health Organization ("PAHO") specially appeared in the district court and is a party in this Court solely for the purpose of challenging the district court's order compelling the production of discovery not necessary to resolve the question of PAHO's immunity.

Defendants Joaquin Molina, Alberto Kleiman, and ten unnamed "Doe" individuals are identified in the operative complaint, but they did not appear or participate in the proceedings below and are not parties before this Court.

No amici appeared or participated in the proceedings below, and none have yet done so in this Court.

**B.  Rulings Under Review**

This is an interlocutory appeal from the order entered by Chief Judge James E. Boasberg on August 12, 2024, which granted plaintiffs' motion to compel

discovery.  Dkt.113.  ("Dkt." citations refer to entries on the district court's docket.)  The order is not published in the Federal Supplement but is available at 2024 WL 4251808 and reproduced in the appendix at JA1237-1244.

## C.    Related Cases

This case was before this Court in *Rodriguez v. Pan American Health Organization*, No. 20-7114.  Counsel is unaware of any other related cases within the meaning of Circuit Rule 28(a)(1)(C).

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, PAHO certifies that it is an international public-health organization that works with its 35 Member States throughout the Americas to improve and protect people's health. Because it is an international organization rather than a corporation, association, partnership, or similar entity, PAHO respectfully submits that it is not subject to Federal Rule of Appellate Procedure 26.1 or Circuit Rule 26.1.

Without waiving the foregoing position or any of PAHO's immunities, privileges, or defenses, PAHO states that it has no parent company and that no company (publicly held or otherwise) has a ten percent or greater ownership interest in PAHO.

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ........................................ iii

TABLE OF AUTHORITIES ................................................ vii

GLOSSARY ...................................................................xi

INTRODUCTION ............................................................1

JURISDICTION.............................................................3

RELEVANT PROVISIONS ...................................................3

ISSUES PRESENTED........................................................4

STATEMENT ................................................................4

     A.      The Pan American Health Organization ..............................4

     B.      Mais Médicos ..................................................6

     C.      Plaintiffs' Claims And PAHO's Motions To Dismiss ........................8

     D.      The Challenged Discovery Order.......................................13

SUMMARY OF ARGUMENT ...............................................14

STANDARDS OF REVIEW .................................................18

ARGUMENT ...............................................................18

I.     THIS COURT HAS JURISDICTION....................................18

II.    THE DISTRICT COURT'S JURISDICTIONAL-DISCOVERY ORDER IS
      ERRONEOUS ....................................................28

A.  Under This Court's Precedent, Discovery Could Be Ordered Here Only To The Extent Necessary To Verify Facts Crucial To Determining Jurisdiction, And Only In Connection With A Potentially Viable Jurisdictional Theory ..............................................................................28

B.  The District Court Impermissibly Ordered Jurisdictional Discovery On A Theory That Has Not Been Held Plausible ...........................................................................32

    1.  The jurisdictional theory that has been deemed plausible here is that PAHO allegedly engaged in "moving … money, for a fee, between Cuba and Brazil" using U.S. bank accounts ............................................32

    2.  The district court ordered jurisdictional discovery on a different theory: PAHO allegedly providing support for Mais Médicos from the United States ....................35

C.  Even If Jurisdictional Discovery Could Be Ordered Under An Untested Theory, No Discovery Is Warranted On Plaintiffs' New Theory Of PAHO's Alleged Support For Mais Médicos From The United States Because That Theory Could Not Establish Jurisdiction ............................................39

    1.  Plaintiffs' surviving claims are not "based upon" PAHO's administration of Mais Médicos ...............................40

    2.  PAHO's administration of Mais Médicos is not commercial activity ..................................................41

    3.  Any administration of Mais Médicos by PAHO from the United States cannot satisfy the U.S.-nexus requirement ........................................................44

    4.  Even if this theory were legally viable, discovery under it is not necessary to verify any specific factual allegation crucial to the immunity determination ........................................................46

D.     *Nyambal*'s Standard For Ordering Jurisdictional Discovery From PAHO On The Sole Live Theory Is Not Met..................................................................................47

    1.    The evidence already provided shows that PAHO did not engage in the commercial activity of "moving money for a fee".........................................48

        a.    PAHO did not receive any "fee" in connection with Mais Médicos......................................49

        b.    PAHO did not move money under a pretext of arranging medical services .........................................53

    2.    The evidence already provided shows that any "moving of money" PAHO did in connection with Mais Médicos was not carried on in the United States ........................................................................54

CONCLUSION ....................................................................................57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Anglo-Iberia Underwriting Management v. P.T. Jamsostek*, 600 F.3d 171 (2d Cir. 2010) .................................................................. 42-43

* *Butler v. Sukhoi Co.*, 579 F.3d 1307 (11th Cir. 2009) ............................. 15, 31-32

*CapitalKeys, LLC v. Democratic Republic of Congo*, 2021 WL 2255362 (D.D.C. June 3, 2021) ...................................................45

*Cicippio v. Islamic Republic of Iran*, 30 F.3d 164 (D.C. Cir. 1994) ......................44

*First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172 (2d Cir. 1998) ..........................................................................46

*In re Flint Water Cases*, 960 F.3d 820 (6th Cir. 2020) .................................... 19-20

*In re Papandreou*, 139 F.3d 247 (D.C. Cir. 1998) ...........................................31, 56

*Jam v. International Finance Corp.*, 586 U.S. 199 (2019) ....... 23, 28, 30, 42, 45, 50

* *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020 (D.C. Cir. 1997) .............................................................42

*Kettey v. Saudi Ministry of Education*, 53 F.Supp.3d 40 (D.D.C. 2014) ...............45

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123 (D.C. Cir. 2004) .............................................................29

*Koons v. United States*, 518 U.S. 81 (1996) .........................................................18

*Lewis v. Mutond*, 62 F.4th 587 (D.C. Cir. 2023) .................................................18

*Maxey v. Fulton*, 890 F.2d 279 (10th Cir. 1989) .................................................27

*Mendaro v. World Bank*, 717 F.2d 610 (D.C. Cir. 1983) ................................. 29-30

*Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100 (2009) ........................... 25-26

\*     Items chiefly relied on are marked with an asterisk.

*NetworkIP, LLC v. Federal Communications Commission*, 548 F.3d 116 (D.C. Cir. 2008) ........................................................................40

\* *Nyambal v. International Monetary Fund*, 772 F.3d 277 (D.C. Cir. 2014) ................1-3, 14-15, 19, 21-24, 27, 30-31, 39, 46-49, 51, 53-54, 56-57

*OBB Personenverkehr AG v. Sachs*, 577 U.S. 27 (2015) .................................. 40-41

*Phoenix Consulting Inc. v. Republic of Argentina*, 216 F.3d 36 (D.C. Cir. 2000) ..................................................................................25, 32

*Process & Industrial Developments Ltd. v. Federal Republic of Nigeria*, 962 F.3d 576 (D.C. Cir. 2020) ...................................23, 29

*Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139 (1993).............................................................................19

*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992)...............................41

*Republic of Hungary v. Simon*, 145 S.Ct. 480 (2025) ............................................30

*Rodriguez v. Pan American Health Organization*, 29 F.4th 706 (D.C. Cir. 2022)............................................. 3, 10, 16, 18, 22, 33-34, 48-49, 53-54

*Rodriguez v. Pan American Health Organization*, 502 F.Supp.3d 200 (D.D.C. 2020) .........................................................9-10, 16, 33-34

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993) .........................................................41

*Taiwan v. United States District Court for the Northern District of California*, 128 F.3d 712 (9th Cir. 1997) ................................................ 29-30

*Will v. Hallock*, 546 U.S. 345 (2006).....................................................................22

*Zuza v. Office of the High Representative*, 857 F.3d 935 (D.C. Cir. 2017) ...........................................................................................19

## CONSTITUTIONS AND STATUTES

Constitution of the Pan American Health Organization, https://www.paho.org/en/documents/constitution-pan-american-health-organization ....................................................................................5

18 U.S.C.
 §1589 ...............................................................................9
 §1964 ...............................................................................3

* 22 U.S.C. §288a .............................. 6, 10, 19, 25, 28-29, 31

28 U.S.C.
 §1291 ...............................................................................3
 §1330 ...............................................................................3
 §1331 ...............................................................................3
 §1595 ...............................................................................3
 §1603 ......................................................................... 44-45
 §1604 .............................................................................29
 * §1605 ...................................... 3, 9-10, 16-17, 30, 40-41, 46, 54

Pan American Sanitary Convention, 44 Stat. 2031 (1924)................... 4-5

Racketeering Influenced and Corrupt Organizations Act, Pub. L. 91-450, 84 Stat. 922 (1970) ...............................................................9

Trafficking Victims Protection Act, Pub. L. 106-386, 114 Stat. 1464 (2000)...............................................................................8

## RULES, REGULATIONS, AND LEGISLATIVE MATERIALS

Federal Rule of Appellate Procedure 4 .......................................3

Federal Rule of Civil Procedure 30 .........................................14

*Designating the Pan American Health Organization as a Public International Organization Entitled to Enjoy Certain Privileges, Exemptions, and Immunities*, Exec. Order 10864, 25 Fed. Reg. 1507 (Feb. 18, 1960)...........................................................6

Senate Report No. 79-861 (1945) ........................................26, 32

## OTHER AUTHORITIES

Brief for the United States as Amicus Curiae, *Rodriguez v. Pan American Health Organization*, No. 20-7114 (D.C. Cir. June 14, 2021) .................................................. 8, 11, 43-44, 50-51

Pan American Health Organization, *Cooperation Among Countries for Health Development*, https://www.paho.org/en/cchd (visited Apr. 30, 2025)..................................................................5

Pan American Health Organization, *History of the Pan American Health Organization*, https://www.paho.org/en/who-we-are/history-pan-american-health-organization-paho (visited Apr. 30, 2025)..................................................................4

Pan American Health Organization, *PAHO Countries and Centers*, https://www.paho.org/en/countries-and-centers (visited Apr. 30, 2025)..................................................................4

Pan American Health Organization, *Technical Cooperation Among Countries* (1998), https://iris.paho.org/bitstream/handle/10665.2/20940/doc513.pdf..................................................................5

Pan American Health Organization, *Technical Cooperation Among Countries*, https://archive.iwlearn.net/paho.org/english/d/csu/TCC05index-Eng.htm (visited Apr. 30, 2025)..................................................................5

Pan American Health Organization, *Who We Are*, https://www.paho.org/en/who-we-are (visited Apr. 30, 2025)..................................................................5

World Health Organization, *Country Case Studies on Primary Health Care, Brazil: The* Mais Médicos *Programme* (2018), https://apps.who.int/iris/bitstream/handle/10665/326084/WHO-HIS-SDS-2018.19-eng.pdf..................................................................6

15B Wright, Charles Alan & Arthur R. Miller, *Federal Practice & Procedure* §3914.23 (2d ed. 2024)..................................................................20

## GLOSSARY

FSIA          Foreign Sovereign Immunities Act

IOIA           International Organizations Immunities Act

PAHO        Pan American Health Organization

PSC            program support costs

**INTRODUCTION**

Plaintiffs here are former Cuban doctors who sued PAHO alleging that while employed by the Cuban government, they were forced by Cuba to participate in a public-health program in Brazil run by the Brazilian government and known as "Mais Médicos" (Portuguese for "More Doctors"). Plaintiffs allege that the program involved human trafficking and that putative defendant the Pan American Health Organization ("PAHO") knowingly benefitted from that alleged trafficking in violation of U.S. law, by moving money for a fee between the governments of Brazil and Cuba.

This appeal challenges an order the district court entered requiring PAHO to answer over a dozen jurisdictional-discovery requests in connection with PAHO's motion to dismiss, a motion based on PAHO's immunity from suit under the International Organizations Immunities Act ("IOIA"). The question here is whether that discovery order is erroneous under this Court's holding in *Nyambal v. International Monetary Fund*, 772 F.3d 277 (D.C. Cir. 2014), that an international organization is immune from jurisdictional discovery save to the extent necessary to "'verify allegations of specific facts crucial to an immunity determination,'" *id.* at 281. The answer is that the discovery order does run afoul of *Nyambal*. Indeed, despite seeking broad discovery, plaintiffs have never identified any "'specific fact[]'" that any of the discovery they seek is required to "'verify,'" *id.* That is no

doubt because the facts showing PAHO's IOIA immunity have already been established by the enormous volume of documents (including sworn declarations) that PAHO has voluntarily provided in support of its motion to dismiss. Because *Nyambal*'s standard for discovery is not satisfied, the district court's order should be vacated so that PAHO's motion to dismiss can be decided without further delay.

Indeed, the discovery order should be vacated for any of a number of reasons. For starters, the district court erred by ordering PAHO to produce discovery that goes far beyond the single jurisdictional theory that this Court (and the district court) held sufficient to survive PAHO's facial motion to dismiss. And even if discovery could be ordered on an untested jurisdictional theory, plaintiffs' new theory is not legally viable—i.e., would not establish jurisdiction even if it were factually true—and hence cannot warrant discovery. Finally, as to plaintiffs' one live jurisdictional theory (that PAHO moved money for a fee using U.S. banks), PAHO has, as noted, voluntarily provided evidence conclusively disproving that theory. Under *Nyambal*, that "obviate[s] the need for any further discovery." 772 F.3d at 282.

In short, none of plaintiffs' requested discovery is proper because none is necessary to resolve PAHO's motion to dismiss. The district court's order compelling that discovery was thus contrary to *Nyambal* and should be vacated.

In filing this opposition, PAHO continues to assert, does not waive, and expressly preserves all its privileges and immunities.

## JURISDICTION

The operative complaint alleges that the district court has subject-matter jurisdiction under 18 U.S.C. §1964 and 28 U.S.C. §§1330, 1331, 1595, and 1605. JA26. In a prior appeal, this Court determined that plaintiffs "sufficiently alleged that PAHO's conduct of 'moving money for a fee' constituted 'commercial activity carried on in the United States'" within the meaning of the relevant exception to PAHO's IOIA immunity from jurisdiction. *Rodriguez v. Pan American Health Organization*, 29 F.4th 706, 717 (D.C. Cir. 2022). The Court emphasized that its ruling was limited to the sufficiency of plaintiffs' allegations at the motion-to-dismiss stage, observing that "the district court retains the authority to reassess its jurisdiction as the litigation progresses." *Id.*

The district court issued the jurisdictional-discovery order being appealed on August 12, 2024. JA1237-1244. While preserving all defenses and immunities, PAHO noticed its appeal on September 11. Dkt.114. That notice was timely under Federal Rule of Appellate Procedure 4(a)(1)(A). As elaborated below (pp.18-27), this Court has jurisdiction under 28 U.S.C. §1291 and the collateral-order doctrine. *See Nyambal*, 772 F.3d at 279-280.

## RELEVANT PROVISIONS

Relevant statutory provisions are set forth in the addendum.

**ISSUES PRESENTED**

1.      Whether this Court has collateral-order jurisdiction over this appeal (addressed per the motions panel's order referring plaintiffs' motion to dismiss to the merits panel).

2.      Whether the district court erred in ordering PAHO to produce jurisdictional discovery that is irrelevant to plaintiffs' sole remaining theory of jurisdiction and/or unnecessary to resolve whether PAHO is immune from this litigation.

**STATEMENT**

**A.      The Pan American Health Organization**

PAHO is the world's oldest international public-health organization, founded in 1902 by the United States and other countries of the Americas to foster collaborative responses to transnational public-health problems, including epidemics and pandemics, lack of access to healthcare, and the spread of communicable diseases. *See* PAHO, *History of the Pan American Health Organization*, https://www.paho.org/en/who-we-are/history-pan-american-health-organization-paho (all webpages cited herein were visited April 30, 2025). PAHO's 35 Member States comprise every nation of the Americas, including the United States, Brazil, and Cuba. *See* PAHO, *PAHO Countries and Centers*, https://www.paho.org/en/countries-and-centers; *see also* Pan American Sanitary

Convention, 44 Stat. 2031 (1924) (formalizing the United States' membership in PAHO's predecessor organization).  PAHO's mission is "to promote and coordinate efforts of the countries of the Western Hemisphere to combat disease, lengthen life, and promote the physical and mental health of the people."  Constitution of the Pan American Health Organization art. I, https://www.paho.org/en/documents/ constitution-pan-american-health-organization.

PAHO's work advances the interests of all its Members States, in terms of public health, security, and regional stability.  *See* PAHO, *Who We Are*, https://www.paho.org/en/who-we-are.  Diseases know no borders, and outbreaks anywhere in the hemisphere can directly affect the health and safety of people everywhere.

As part of its mission to advance public health throughout the Americas, PAHO promotes cooperation between and among Member States, and provides support to them.  PAHO, *Technical Cooperation Among Countries* 6 (1998), https://iris.paho.org/bitstream/handle/10665.2/20940/doc513.pdf.  This support encompasses administrative and technical assistance in the area of public health, including what is known as "technical cooperation."  *See* JA179; PAHO, *Technical Cooperation Among Countries*, https://archive.iwlearn.net/paho.org/english/d/csu/ TCC05index-Eng.htm; PAHO, *Cooperation Among Countries for Health Development*, https://www.paho.org/ en/cchd. Technical cooperation spans a variety

of activities, such as public-health research, training, boosting countries' capacity to provide healthcare, education, skill building, access to technology, and administrative support.  JA179-180.

PAHO is a presidentially designated "international organization entitled to enjoy the … immunities conferred by the" IOIA.  Exec. Order 10864, 25 Fed. Reg. 1507 (Feb. 18, 1960).  It thus "enjoy[s] the same immunity from suit and every form of judicial process as is enjoyed by foreign governments."  22 U.S.C. §288a(b).

## B.    Mais Médicos

One of PAHO's most significant technical-cooperation programs in recent years supported Mais Médicos.  JA183.  The Brazilian government established Mais Médicos to expand and improve the country's public-health system and to provide much-needed medical care to roughly 60 million people, including millions living in the most remote, underserved areas of Brazil's vast Amazon basin—many of whom had never seen a doctor.  JA180-181; JA190; WHO, *Country Case Studies on Primary Health Care, Brazil: The Mais Médicos Programme* 5 (2018), https://apps.who.int/iris/bitstream/handle/10665/326084/ WHO-HIS-SDS-2018.19-eng.pdf.

At the request of Brazil's Ministry of Health, and pursuant to a bilateral agreement between PAHO and Brazil, PAHO provided wide-ranging technical, administrative, and public-health support to Mais Médicos.  JA182.  Specifically,

PAHO provided assistance to achieve three primary objectives: (1) strengthening Brazil's healthcare infrastructure, (2) increasing medical-school enrollment, and (3) addressing limits on the availability of medical care in Brazil due to the country's doctor shortage. JA182-183; JA185; JA190. In furtherance of the third objective, PAHO entered a bilateral agreement with the Cuban Ministry of Public Health to facilitate the deployment to Brazil of Cuban government-employed doctors to provide much-needed public healthcare to people in Brazil. JA406-425.

Because Mais Médicos was a national "voluntary-contribution" project, meaning that Member States benefiting from the project had to pay all associated direct and indirect costs, PAHO's support for Mais Médicos was funded entirely with payments to PAHO from the government of Brazil that were earmarked for the program, rather than with funds from PAHO's general budget. *See* JA239. All the funds that PAHO received from Brazil in connection with its participation in Mais Médicos were received from and held in bank accounts outside the United States. JA240-244; JA647-654; JA656-658. All of PAHO's payments to the government of Cuba for the services it provided to the program were similarly made from and to bank accounts outside the United States. JA242-245; JA655-657.

Consistent with both the standard practices of agencies in the United Nations system (like PAHO) and PAHO's internal rules and procedures, the only funds that PAHO received from Brazil and retained for itself in connection with Mais Médicos

were payments to cover program support costs ("PSC"), i.e., PAHO's indirect or overhead costs associated with extrabudgetary projects. JA655; JA196-198. Specifically, in accordance with Brazilian law and to help offset PSC, PAHO retained five percent of Mais Médicos direct expenses. JA240; JA245; JA198-199. As the United States explained in its amicus brief in the prior appeal in this case, Member States' payments to help cover PSC enable international organizations to recoup costs that are not covered by Member States' voluntary contributions and reimbursements. Brief for the United States 7-8, *Rodriguez v. Pan American Health Organization*, No. 20-7114 (D.C. Cir. June 14, 2021) ("U.S. Amicus Br."); *accord* JA195-196. PSC payments ensure that PAHO's regular budget (which is funded by all Member States) is not financing projects that benefit only one or a few Member States. JA197.

### C. Plaintiffs' Claims And PAHO's Motions To Dismiss

As mentioned, plaintiffs are former Cuban doctors who participated in Mais Médicos while serving as civil-service employees of the Cuban government. JA24-25. They filed this lawsuit on behalf of a putative class of similarly situated individuals, alleging that their participation in Mais Médicos amounted to forced labor and human trafficking. JA22-23. Plaintiffs further allege that PAHO both perpetrated and benefited from this alleged forced labor and trafficking, in violation of the Trafficking Victims Protection Act, Pub. L. 106-386, 114 Stat. 1464 (2000),

and the Racketeer Influenced and Corrupt Organizations Act, Pub. L. 91-450, 84 Stat. 922 (1970) ("Racketeering Act"). JA26; JA81-87.

After successfully moving to have the case transferred from the federal court in Florida where plaintiffs filed it, PAHO filed a facial motion to dismiss for lack of subject-matter jurisdiction, asserting immunity from suit under the IOIA. Dkt.54. The district court agreed with PAHO that virtually all of plaintiffs' claims were barred by the IOIA, but held (assuming plaintiffs' well-pleaded factual allegations to be true) that the lone remaining claims plausibly alleged jurisdiction, i.e., plausibly satisfied an exception to PAHO's IOIA immunity. *Rodriguez*, 502 F.Supp.3d at 223. Those claims were that PAHO violated 18 U.S.C. §1589(b) (a provision of the Trafficking Victims Protection Act) by knowingly benefiting from participating in a human-trafficking "venture," along with the concomitant claim under the Racketeering Act. *Rodriguez*, 502 F.Supp.3d at 223. The gist of those companion claims, the court concluded, was that PAHO's participation in Mais Médicos involved (in the court's words) the "moving of money, for a fee, between Cuba and Brazil." *Id.* at 214. And that moving of money, the court read the complaint to allege, was "carried on in the United States" (in the language of the relevant statutory exception to IOIA immunity, 28 U.S.C. §1605(a)(2)) because Brazil's transfers of money to PAHO allegedly went to PAHO's "Citibank account in Washington, D.C.," and because PAHO's Director "based out of PAHO's

headquarters in [Washington], [allegedly] approved the agreements committing PAHO to its role as intermediary" between Cuba and Brazil. *Rodriguez*, 502 F.Supp.3d at 215. The court held that these allegations plausibly alleged jurisdiction under the commercial-activity exception to IOIA immunity, 28 U.S.C. §1605(a)(2).[1]

This Court affirmed the district court's holding that plaintiffs' remaining companion claims plausibly alleged jurisdiction under the theory of moving money for a fee using U.S. bank accounts. *Rodriguez*, 29 F.4th at 717. This Court did not address the district court's ruling regarding where PAHO's Director is located (and that issue is not relevant to this appeal, because the district court did not grant any of plaintiffs' jurisdictional-discovery requests based on that issue).

On remand, PAHO filed a factual motion to dismiss for lack of subject-matter jurisdiction, asserting IOIA immunity and attaching four declarations and documentary evidence disproving the factual allegations on which the lone surviving theory of jurisdiction was based. Specifically, the evidence PAHO provided demonstrates that PAHO did not move money for a fee in connection with Mais Médicos, nor moved money between Brazil and Cuba through any U.S. bank account. Dkt.80 at 26-30, 37-39. Rather, one of PAHO's declarants explained,

---

[1] The commercial-activity exception actually appears in the Foreign Sovereign Immunities Act ("FSIA"). As noted, the IOIA provides that designated international organizations enjoy the same immunity as foreign sovereigns. 22 U.S.C. §288a(b).

PAHO charged no "fees" to move money, instead retaining for itself only PSC payments, i.e., the standard percentage payment to offset Brazil's share of overhead and indirect costs incurred by PAHO, and it made all relevant financial transactions using banks in Brazil and Cuba, not the United States. JA242-244. The receipt of PSC payments, the declarant further explained (echoing the United States' amicus brief), is a standard mechanism by which PAHO and many other international organizations recover indirect costs incurred in providing technical, administrative, and other support in connection with Member States' extrabudgetary programs like Mais Médicos. JA240; U.S. Amicus Br.7-8. The documentary evidence PAHO appended to its factual motion to dismiss to support its declarants' assertions included (1) policies regarding the collection of PSC payments, *see* JA202-206; JA215-221; JA223-235; (2) financial reporting and invoices relating to Mais Médicos, *see* JA248-252; and (3) the agreements between PAHO and Brazil, and between PAHO and Cuba, regarding PAHO's participation in Mais Médicos, *see* JA319-425.

In response to the motion, plaintiffs sent PAHO almost 60 wide-ranging discovery requests. JA623-636. When PAHO objected that the requests were overbroad, burdensome, and in most cases unconnected to the one jurisdictional theory this Court had deemed sufficient to survive a facial motion to dismiss, plaintiffs sent a revised set of 30 requests, which PAHO considered to still be

overbroad and largely untethered to plaintiffs' remaining jurisdictional theory. JA638-643. But seeking to avoid burdening the district court with motions practice, PAHO provided plaintiffs with another declaration and more than one thousand additional pages of documentary evidence, including bank statements covering all relevant payments. Dkts.93-8, 93-9; JA645-1087. Those statements show that all transfers of funds related to Mais Médicos from the Brazilian government to PAHO and from PAHO to Cuba were made using bank accounts in Brazil or Cuba, not the United States. JA645-1087. Plaintiffs nevertheless moved to compel jurisdictional discovery, seeking responses to each of its 30 requests. Dkt.91.

The district court denied the motion without prejudice, concluding that plaintiffs' requests were "certainly too broad," and ordering plaintiffs to narrow their requests. Dkt.112 at 5. Instead, plaintiffs sent PAHO an expanded list of requests (more than *doubling* the number of document requests, for example). *See* JA1165. The parties then engaged in further negotiations, during which plaintiffs insisted that PAHO respond to ten document requests and two interrogatories, and provide a witness to be deposed. PAHO declined to provide the requested discovery, on the ground that it was unnecessary to verify any specific jurisdictional fact—plaintiffs never identified any such fact, despite multiple requests from PAHO to do so—and untethered to the lone theory of jurisdiction that the district court and this Court deemed sufficient to survive PAHO's facial motion to dismiss. *See* JA1165-1175.

When the discussion ended without an agreement, the parties asked the district court for a ruling. *Id.*

### D. The Challenged Discovery Order

The district court ordered PAHO to respond in whole or in part to each of plaintiffs' requests. *See* JA1237-1244. The court recognized that "[s]ince the original motion-to-dismiss proceedings, Plaintiffs have dreamt up several new theories of [a U.S.] nexus" for purposes of the commercial-activity exception. JA1238. In particular, rather than limiting their requests to validating allegations that PAHO "moved money for a fee" through U.S. banks, plaintiffs sought discovery regarding whether retained PSC payments later "ended up in the United States," JA1239, and whether such funds "could have been used to support the administration of [Mais Médicos] in the United States," JA1240-1241. While acknowledging that the court "cannot compel discovery on a fact that, if proven, would be legally irrelevant to whether a U.S. nexus exists," JA1239, the district court granted plaintiffs most of what they sought, reasoning that the "discovery requests aimed at uncovering whether the full sum [of Mais Médicos funds] indeed traveled through the U.S. and how the 5% fee (if it indeed ended up in the United States) was used are relevant to a valid theory of U.S. nexus," JA1241.

Although its order is somewhat unclear, the district court appeared to fully grant six of plaintiffs' ten requests for production and to partially grant the remaining

four.  *See* JA1241-1243.  The requests are broad—demanding, for instance, that PAHO produce "[r]ecords of all transactions relating to or arising from the Mais Medicos program" from the primary account used in connection with the program (a Banco do Brasil account), any Citibank account anywhere in the world, or any other bank located in the United States.  JA1241-1242.  The court also ordered PAHO to respond to two interrogatories and to have its now-retired director of administration sit for a deposition under Federal Rule of Civil Procedure 30(b)(6).  JA1243.

## SUMMARY OF ARGUMENT

I.  This Court has collateral-order jurisdiction over this appeal.  The Court has squarely held that a "district court's grant of discovery against an absolutely immune defendant … qualif[ies] for collateral review."  *Nyambal*, 772 F.3d at 280.  Although plaintiffs say *Nyambal* applies only if the defendant has not previously appealed the denial of a facial motion to dismiss, nothing in *Nyambal*'s opinion or reasoning supports that reading, which would improperly require putatively immune entities to choose between appealing the denial of a facial motion to dismiss and preserving their ability to challenge a jurisdictional-discovery order.

Even if *Nyambal* did not resolve the matter, the three collateral-order prerequisites confirm that appellate jurisdiction lies here.  The challenged order: (1) conclusively requires PAHO to respond to plaintiffs' discovery requests,

(2) implicates an important issue and is separate from the merits of plaintiffs' claim, and (3) effectively cannot be reviewed after final judgment. Collateral-order jurisdiction also comports with Congress's desire to shield international organizations from the burdens of litigation.

II. The discovery order violates PAHO's congressionally and presidentially conferred presumptive immunity.

A. Under the IOIA, international organizations like PAHO are presumptively immune from suits in U.S. courts. And presumptively immune defendants may be ordered to produce jurisdictional discovery "only to verify allegations of specific facts crucial to an immunity determination." *Nyambal*, 772 F.3d at 281 (quotation marks omitted). Discovery cannot be ordered, moreover, on a theory of jurisdiction that has not been held sufficient to survive a facial motion to dismiss. *See Butler v. Sukhoi Co.*, 579 F.3d 1307, 1314 (11th Cir. 2009). Otherwise, plaintiffs could use a single plausible theory of jurisdiction to demand discovery on 5, 10, or 50 other unrelated ones that no court had deemed plausible. That cannot be right, as such fishing expeditions are exactly the kind of litigation burden the IOIA is intended to protect international organizations against.

B. The district court improperly ordered PAHO to produce jurisdictional discovery extending far beyond the only theory of jurisdiction held to be facially viable. As relevant here, that theory is that PAHO (in the court's words) "mov[ed]

15

… money, for a fee, between Cuba and Brazil," using U.S. bank accounts. *Rodriguez*, 502 F.Supp.3d at 214; *see also Rodriguez*, 29 F.4th at 715-717. Yet the court ordered PAHO to provide discovery based on a theory about PAHO's alleged support for Mais Médicos from the United States. For example, the court ordered PAHO to produce records of transactions for bank accounts *outside* the United States, as well as documents and correspondence regarding an independent outside review of Mais Médicos, on the theory that such evidence was "relevant" not to whether U.S. bank accounts were used to move money from Brazil to Cuba (the live theory), but to whether "the administration of the program was carried on in D.C.," JA1241, or whether retained PSC payments were "used to administer the program," JA1242. The court also ordered PAHO to respond to an interrogatory describing the roles of its U.S. officials who worked on Mais Médicos. None of that discovery bears on plaintiffs' sole live theory of jurisdiction.

C.     Even if jurisdictional discovery could be ordered under a new theory, no discovery is warranted on plaintiffs' new theory (involving PAHO's alleged support for Mais Médicos from the United States) because it is not a legally viable theory of IOIA jurisdiction. Plaintiffs' claim is not "based upon" PAHO's administration of Mais Médicos, 28 U.S.C. §1605(a)(2), so whether such administration was "carried on in the United States," *id.*, is irrelevant under the IOIA. Additionally, PAHO's administration of Mais Médicos is not commercial activity

under the IOIA. It is not similar to the type of action by which a private party engages in trade or commerce. Rather, it is akin to a sovereign act, which is immune. To deem any U.S.-based administration of Mais Médicos a "commercial activity" sufficient to confer jurisdiction would cause the commercial-activity exception to swallow the immunity rule and undermine the immunity that has, by design, led numerous international organizations to locate their headquarters in the United States.

Even if plaintiffs' new theory were legally viable, discovery would not be necessary to verify any specific factual allegations crucial to the immunity determination, which is *Nyambal*'s standard for jurisdictional discovery. Whether or not PAHO's Director "initiated" Mais Médicos from the United States is irrelevant because such initiation would not provide the requisite U.S. nexus, given that plaintiffs' claim is not "based upon" (28 U.S.C. §1605(a)) program approvals. In any event, the district court was simply wrong in stating that the complaint alleges such initiation. And as for any allegation that the funds PAHO retained to cover PSC might have been "absorbed into PAHO's general budget," such speculation cannot support a finding of U.S. nexus.

D. No jurisdictional discovery is warranted under plaintiffs' one live theory. The district court reasoned that several of plaintiffs' requests are "relevant" to that theory, but that is not the standard for discovery against a presumptively

immune entity.  And the actual standard (necessary to verify specific facts crucial to the immunity determination) cannot be met, particularly given the voluminous evidence PAHO has provided showing that PAHO did not receive a "fee" in connection with Mais Médicos and that no money paid by Brazil to PAHO or from PAHO to Cuba was paid through a U.S. bank account.

The discovery order should be vacated.

## STANDARDS OF REVIEW

This Court reviews the district court's jurisdictional-discovery order for abuse of discretion.  *See Lewis v. Mutond*, 62 F.4th 587, 590 (D.C. Cir. 2023).  An error of law constitutes an abuse of discretion.  *Koons v. United States*, 518 U.S. 81, 100 (1996).  And this Court reviews *de novo* any questions of law, including regarding immunity under the IOIA, *Rodriguez*, 29 F.4th at 711.

## ARGUMENT

### I.    THIS COURT HAS JURISDICTION

In denying plaintiffs' motion to dismiss this appeal, the Court directed the parties to address appellate jurisdiction in their merits briefs.  2/10/2025 Order. Under binding precedent, jurisdiction is present here.

A.    This Court held in *Nyambal* that a "district court's grant of discovery against an absolutely immune defendant … qualif[ies] for collateral review," i.e., qualifies for interlocutory appellate jurisdiction under the collateral-order doctrine.

772 F.3d at 280. Immediate appeal is appropriate in that circumstance because the IOIA's grant of immunity from "suit" and from "every form of judicial process," 22 U.S.C. §288a(b), "shields defendants not only from the consequences of litigation's results but also from the burden of defending themselves," *Zuza v. Office of the High Representative*, 857 F.3d 935, 938 (D.C. Cir. 2017). And "[j]ust as a district court's denial of sovereign immunity finally determines the foreign state's right to be immune from the burden of a lawsuit, a court's grant of jurisdictional discovery denies an international organization protection from similar burdens." *Nyambal*, 772 F.3d at 280. Accordingly, just as denials of sovereign immunity can be immediately appealed under the collateral-order doctrine, *see Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 143-144 (1993), so can orders of jurisdictional discovery against IOIA-immune defendants, *Nyambal*, 772 F.3d at 280.

In moving to dismiss this appeal, plaintiffs resisted a similar analogy to qualified immunity by citing (MTD Reply 5-6) *In re Flint Water Cases*, 960 F.3d 820 (6th Cir. 2020). But *Flint* actually supports PAHO's position because the district court there stayed all discovery against two defendants regarding the claim for which those defendants were asserting immunity, pending the resolution of all appeals governing the immunity determination. *Id.* at 830. The court ordered discovery against those defendants only in their capacity as non-party witnesses, as that

discovery would be required regardless of the defendants' immunity. *Id.* Taking that approach here would have meant denying plaintiffs' discovery requests while PAHO's factual motion to dismiss remains pending.

*Nyambal*'s ruling regarding collateral-order jurisdiction is an exception to the general principle—which plaintiffs' motion-to-dismiss briefing pervasively but mistakenly invoked—that discovery orders are typically not immediately appealable (at least with non-immune defendants). *See* 15B Wright & Miller, *Federal Practice & Procedure* §3914.23 (2d ed. April 2025 Update). The leading treatise on civil procedure recognizes the same exception, stating that "[a]n order allowing discovery may be appealable" where it infringes a defendant's immunity from "the burdens of litigation." *Id.*

In moving to dismiss this appeal, plaintiffs argued (Mot.16-17) that *Nyambal* applies only where a discovery order precedes any ruling on a motion to dismiss. But *Nyambal* itself imposed no such limitation; the district court here rejected it, *see* Dkt.124 at 4-8; and plaintiffs cite no case in the decade since *Nyambal* that reads the case that way. That is doubtless because plaintiffs' argument involves adding language to the key sentence in *Nyambal*, so that it would read (with plaintiffs' invented limitation bracketed) that a "district court's grant of discovery against an absolutely immune defendant [that has not previously appealed the denial of a

motion to dismiss] is sufficiently conclusive to qualify for collateral review," 772 F.3d at 280.  Plaintiffs cannot re-write *Nyambal*, nor can a panel of this Court.

Under plaintiffs' reading of *Nyambal*, moreover, an international organization would face an untenable choice whenever a plaintiff sued it making factual assertions that are false but that must be taken as true on a facial motion to dismiss. Such an organization would have to forgo challenging the denial of a facial motion to dismiss—and thus forgo its right to have baseless litigation concluded as quickly as possible—in order to preserve its right to challenge an improper order on jurisdictional discovery.  Requiring an international organization to give up one of these rights would not be consistent with the robust protections Congress provided in the IOIA.

It is no answer to say that an international organization in this situation can simply file a *factual* motion to dismiss without first filing a *facial* motion to dismiss. As this case shows, there is an enormous practical difference between the two types of motions, as PAHO's factual motion to dismiss required sworn declarations and voluminous documentary and other evidentiary support, which PAHO had to incur significant costs to gather—a burden the IOIA protects against.  Again, then, plaintiffs' atextual reading of *Nyambal* cannot be reconciled with Congress's decision to minimize litigation burdens for international organizations.

Plaintiffs' proposed re-write of *Nyambal* also has no connection to any of the three requirements for collateral-order jurisdiction, i.e., the basis on which *Nyambal* held the appeal there proper. Those requirements (discussed further below) are that the ruling sought to be appealed (1) "'conclusively determine[s] the disputed question,'" (2) "'resolve[s] an important issue completely separate from the merits of the action,'" and (3) is "'effectively unreviewable on appeal from a final judgment.'" *Will v. Hallock*, 546 U.S. 345, 349 (2006), *quoted in Nyambal*, 772 F.3d at 280. Whether there was a prior motion or appeal has nothing to do with any of those requirements. In terms of those three controlling factors, then, there is no difference between the discovery order appealed in *Nyambal* and the one appealed here.

Plaintiffs' posited a difference in their motion to dismiss this appeal, however, arguing (p.16) that in its prior decision in this litigation, this Court determined that PAHO can "properly be subjected to [the] burden of litigation, including discovery." That is false; this Court held only that the complaint's well-pleaded factual allegations, taken as true, stated a plausible basis for jurisdiction under the IOIA's commercial-activity exception. *See Rodriguez*, 29 F.4th at 717. That holding in no way means that PAHO can be subjected to far-reaching discovery, much of which pertains only to jurisdictional theories no court has held facially valid, and none of which is needed because PAHO has, since this Court's decision, voluntarily provided

evidence that suffices to evaluate the lone jurisdictional theory this Court held survived a facial motion to dismiss. As *Nyambal* explained, the provision of such information can "obviate the need for any further discovery." 772 F.3d at 282. This Court's prior decision did not speak to any of this. That decision therefore does not make the district court's discovery order here any less appealable than the discovery order in *Nyambal* was.

Plaintiffs' motion to dismiss also argued (pp.17-18) that *Nyambal* is inapposite because it was decided before the Supreme Court held in *Jam v. International Finance Corp.*, 586 U.S. 199 (2019), that immunity under the IOIA is coterminous with immunity under the FSIA, *id.* at 207-208. That holding actually cuts *against* plaintiffs: As this Court has explained, "subjecting a foreign sovereign to litigation burdens is precisely what triggers the second and third prongs of the collateral-order doctrine." *Process & Industrial Developments Ltd. v. Federal Republic of Nigeria*, 962 F.3d 576, 582 (D.C. Cir. 2020). *Jam*'s alignment of IOIA and FSIA immunity thus means that "subjecting" an international organization "to litigation burdens is precisely what triggers" the applicability of the collateral-order doctrine. *Id.*

Plaintiffs' motion-to-dismiss briefing responded to this argument by attempting (MTD Reply 6-7) to distinguish *Process & Industrial* on the ground that the order there "was not a review of a stand-alone discovery order rendered after a denial and unsuccessful appeal of an order denying the defendant's legal-immunity

argument." That simply tries to read the same atextual limitation into *Process &*
*Industrial* that plaintiffs wish to read into *Nyambal*, and the argument is equally
infirm as to both cases because nothing in either opinion (or subsequent case law)
supports it. Nor did plaintiffs' repeated mantra that "discovery orders are generally
not appealable," MTD Reply 8-9, move the needle in plaintiffs' favor regarding
*Process & Industrial*; that case (like *Nyambal*) reflected the established exception
(for cases involving putatively immune entities) to the general principle that
discovery orders are not immediately appealable. *Supra* p.20.

B.     Even if *Nyambal* did not control, this appeal would qualify for
collateral-order jurisdiction under a straightforward application of the Supreme
Court's three-factor test.

First, the challenged order conclusively determined that PAHO must respond
to plaintiffs' discovery requests. In moving to dismiss the appeal, plaintiffs never
argued otherwise.

Second, the issue raised in this appeal (the challenged order's validity) is
separate from the merits of plaintiffs' claim that PAHO's conduct during Mais
Médicos violated federal statutes. The issue here is whether plaintiffs' discovery
requests are necessary to "verify allegations of specific facts crucial to [the]
immunity determination," *Nyambal*, 772 F.3d at 281, on a theory that has been held
sufficient to survive a facial motion to dismiss, not whether plaintiffs' claims have

merit, whether the complaint otherwise states a claim for relief, or even whether PAHO has immunity. The propriety of the discovery order is also an important question, implicating PAHO's congressionally conferred immunity and, relatedly, an international organization's ability to do its critical public-health work without the burdens of domestic litigation.

Third, the issue of PAHO's immunity from jurisdictional discovery cannot be effectively reviewed on appeal from final judgment because, by then, the harm to PAHO of being subjected to the burdens of jurisdictional discovery will have irreversibly occurred. As this Court has explained, in fact, "to defer the question is to frustrate the significance and benefit of entitlement to immunity from suit." *Phoenix Consulting Inc. v. Republic of Argentina*, 216 F.3d 36, 39 (D.C. Cir. 2000) (quotation marks omitted).

If more were needed, *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100 (2009), confirms that collateral-order review is appropriate here. There, the Supreme Court explained that a "decisive consideration" in determining if an order is immediately appealable is "whether delaying review until the entry of final judgment 'would imperil a substantial public interest.'" *Id.* at 107. Here, delaying review would vitiate PAHO's IOIA immunity from "every form of judicial process," 22 U.S.C. §288a(b). And the IOIA's history indicates that, in conferring that immunity, Congress decided that international organizations should have strong

protections from the burdens of litigation to "strengthen their position" and avoid diverting resources when "carry[ing] on their activities in other countries."  S.Rep. No. 79-861, at 2 (1945).  Hence, the "substantial public interest," *Mohawk*, 558 U.S. at 107, in shielding international organizations from such burdens so that they can devote their time and resources to critical work (here, PAHO's efforts to advance public health throughout the Americas) would be severely undermined if organizations had to bear the burdens of intrusive discovery before a court of appeals assesses whether such an intrusion was consistent with the IOIA.

The Supreme Court's collateral-order precedent also reinforces the infirmity of plaintiffs' attempt to distinguish *Nyambal* from this case based on the two cases' procedural postures.  As plaintiffs' motion to dismiss this appeal acknowledged (p.10), whether the collateral-order doctrine applies is not "an individualized … inquiry" but instead "focus[es] … on the entire category to which a claim belongs," *Mohawk*, 558 U.S. at 107 (quotation marks omitted).  *Nyambal* establishes that this *category* of claims (challenges to orders imposing discovery on immune defendants) is subject to immediate appeal.  Plaintiffs' arguments regarding the specific circumstances of this case cannot take it out of that categorical rule.

C.    The new arguments plaintiffs offered in their reply supporting their motion to dismiss the appeal are unpersuasive.  For instance, plaintiffs argued (p.9) that "[d]iscovery orders directed to a party claiming immunity are not immediately

appealable … '[when the discovery orders] are narrowly tailored to uncover only those facts needed to rule on the immunity claim'" (second alteration in original) (quoting *Maxey v. Fulton*, 890 F.2d 279, 282-283 (10th Cir. 1989)). That does not help plaintiffs because PAHO's entire claim in this appeal is that the district court ordered discovery that is *not* "narrowly tailored to uncover only those facts necessary" to resolve the district court's jurisdiction, *Maxey*, 890 F.2d at 282-283, and hence that the discovery order thus impermissibly infringes PAHO's immunities. *Infra* §II.B.

Equally flawed was plaintiffs' argument that jurisdiction is lacking because a contrary holding would "invite[] defendants to drag out litigation unduly through piecemeal appeals." MTD Reply 2; *accord id.* at 11. If that argument were enough, interlocutory appeal would never be available. That is not the law. Rather, interlocutory review is available when any drawbacks from prolonging litigation through mid-litigation appeals are deemed to be outweighed by the drawbacks of not permitting such review. As explained, this Court has already concluded that that is situation here, squarely holding that the "grant of discovery against an absolutely immune defendant … qualifies for collateral review." *Nyambal*, 772 F.3d at 280. That holding is binding.

## II. THE DISTRICT COURT'S JURISDICTIONAL-DISCOVERY ORDER IS ERRONEOUS

The challenged order is improper in multiple respects. For starters, the district court erroneously ordered discovery on what it expressly recognized was a new theory of jurisdiction—one that neither that court nor this Court ever approved. (Indeed, plaintiffs have never cited approval of that theory by *any* court.) And even if discovery could be granted on a new jurisdictional theory, plaintiffs' theory of jurisdiction based on PAHO's alleged support for Mais Médicos from the United States does not warrant discovery. Finally, on the lone jurisdictional theory that this Court approved as surviving PAHO's facial motion to dismiss (i.e., moving money for a fee using U.S. bank accounts), the record definitively shows that no additional jurisdictional discovery is necessary to conclusively resolve this case in PAHO's favor.

### A. Under This Court's Precedent, Discovery Could Be Ordered Here Only To The Extent Necessary To Verify Facts Crucial To Determining Jurisdiction, And Only In Connection With A Potentially Viable Jurisdictional Theory

1. Under the IOIA, "[i]nternational organizations … enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments." 22 U.S.C. §288a(b). IOIA immunity thus tracks immunity under the FSIA. *See Jam*, 586 U.S. at 207-208. In turn, under the FSIA, "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States,"

except as otherwise provided by federal law. 28 U.S.C. §1604. This immunity (for both foreign states and international organizations) is "not only a defense from liability but also a shield 'from trial and the attendant burdens of litigation.'" *Process & Industrial*, 962 F.3d at 581 (quoting *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004)). That is because the congressionally granted immunity—intended to protect international organizations from having their time and resources diverted by litigation away from their public-oriented missions—would be gravely weakened if international organizations had to proceed all the way to final judgment in order to vindicate their immunity from liability.

Further underscoring international organizations' immunity from the burdens of litigation in U.S. courts, the IOIA provides that covered international organizations (like PAHO) are immune from "search" and "confiscation," and that their "archives … shall be inviolable." 22 U.S.C. §288a(c). This immunity means that the "premises, archives, and communications of international organizations are shielded from interference" by Member States, including those States' respective courts. *Mendaro v. World Bank*, 717 F.2d 610, 615 (D.C. Cir. 1983). The scope of this inviolability is broad, protecting not just physical documents but also the information they contain, thus precluding discovery into "the *contents* of [an] organization's documents," *Taiwan v. United States District Court for the Northern*

*District of California*, 128 F.3d 712, 718 (9th Cir. 1997) (emphasis added). This additional congressionally conferred protection confirms "the fundamental importance of the[] immunities to the growing efforts to achieve coordinated international action." *Mendaro*, 717 F.2d at 615.

Immunity under the FSIA and IOIA is "presumptive[]," applying unless "one of several statutory exceptions" is met. *Jam*, 586 U.S. at 204. To state a viable claim against a presumptively immune defendant, plaintiffs must allege specific facts showing that an immunity exception has plausibly been met. *See Republic of Hungary v. Simon*, 145 S.Ct. 480, 490 (2025). Here, only one exception is relevant: the commercial-activity exception, which withholds immunity:

> in any case … based upon [1] a commercial activity carried on in the United States by the foreign state; [2] an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. §1605(a)(2).

2. This Court held in *Nyambal* that jurisdictional discovery from a presumptively immune international organization can be ordered "only" to the extent necessary to "verify allegations of specific facts crucial to an immunity determination." 772 F.3d at 281 (quotation marks omitted). Discovery should therefore be granted, *Nyambal* said, "only in [the] comparatively rare circumstances" when "a plaintiff articulates a 'specific, well-founded allegation'" that the evidence

sought is needed to evaluate jurisdiction.  *Id.*  Mere relevance, the Court has further held, "is not enough."  *In re Papandreou*, 139 F.3d 247, 253 (D.C. Cir. 1998).  And "a district court authorizing discovery to determine whether immunity bars jurisdiction must proceed with circumspection, lest the evaluation of the immunity itself encroach unduly on the benefits" of immunity.  *Id.*  That limitation makes good sense in light of the broader context of the IOIA, which provides archival immunity in addition to immunity from litigation.  *See* 22 U.S.C. §288a(c).  An organization's archival immunity should not be violated to support its immunity from litigation unless absolutely necessary.

These same limitations mean that jurisdictional discovery cannot be ordered on a theory of jurisdiction that has not been held sufficient to survive a facial motion to dismiss (assuming that a facial motion is filed).  *Butler v. Sukhoi* illustrates the point.  There, the district court denied a motion to dismiss filed by foreign corporations based on their FSIA immunity and ordered them to produce jurisdictional discovery.  579 F.3d at 1310-1311.  The Eleventh Circuit reversed, holding (as to the order for discovery) that "[i]nasmuch as the complaint was insufficient as a matter of law to establish a *prima facie* case" for jurisdiction, "the district court abused its discretion in … granting discovery on the jurisdictional issue."  *Id.* at 1314.  Indeed, the court of appeals had "little difficulty concluding that the need to protect [the defendants'] claim to immunity from discovery greatly

outweighed any competing need for further discovery." *Id.* at 1314-1315. Jurisdictional discovery thus must be limited to a theory that a court has found potentially viable.

The principles established in *Nyambal*, *Butler*, and related decisions align with what the IOIA's history indicates was Congress's intent to "strengthen the[] position" of international organizations while they are "carry[ing] on their activities in other countries." S.Rep. No. 79-861, at 2; *supra* pp.25-26. Permitting jurisdictional discovery on a theory not held legally viable would impermissibly "burden[]" an international organization that later "proves to be immune from suit," thereby "frustrat[ing] the significance and benefit of entitlement to immunity from suit." *Phoenix*, 216 F.3d at 39-40. That approach would also permit plaintiffs to use one plausibly pleaded jurisdictional theory as a basis to seek discovery into any number of untested theories—just as plaintiffs seek to do here.

## B. The District Court Impermissibly Ordered Jurisdictional Discovery On A Theory That Has Not Been Held Plausible

### 1. The jurisdictional theory that has been deemed plausible here is that PAHO allegedly engaged in "moving … money, for a fee, between Cuba and Brazil" using U.S. bank accounts

After the district court's and this Court's rulings on PAHO's facial motion to dismiss, there is one live theory of liability and one live theory of jurisdiction in this case.

The only live theory of liability is that PAHO benefited financially by knowingly participating in what it knew to be a human-trafficking enterprise. *See Rodriguez*, 29 F.4th at 710; *Rodriguez*, 502 F.Supp.3d at 223. The only live theory of jurisdiction is that plaintiffs' claim of liability is "based upon" commercial activity "carried on in the United States" because plaintiffs allege that PAHO's participation in Mais Médicos and receipt of a financial benefit included (in the district court's words) "moving … money, for a fee, between Cuba and Brazil," using U.S. bank accounts. *Rodriguez*, 502 F.Supp.3d at 214-215. (Plaintiffs also alleged that jurisdiction exists because PAHO waived its immunity, but that theory is not at issue in this appeal because plaintiffs did not press it and the district court did not rely on it a basis for discovery.) More specifically as to the required U.S. nexus, the district court, in concluding that plaintiffs sufficiently pleaded that the alleged commercial activity was carried on in the United States, relied on plaintiffs' allegation that "PAHO carried out its agreed-to role as financial intermediary using its Citibank account in Washington, D.C." *Id.* at 215; *see also id.* at 214 (relying on plaintiffs' allegation that Mais Médicos agreements "called for Brazil to make payment to PAHO's Citibank account in Washington, D.C." (citing JA30-31). The court also noted plaintiffs' allegation that PAHO's Director "approved the agreements

committing PAHO to its role as intermediary" and that he is "based out of PAHO's headquarters" in Washington, D.C. *Id.* at 214 (citing JA48-50).[2]

In affirming the district court, this Court similarly concluded that the complaint adequately "allege[d] that PAHO 'moved money for a fee' under the 'pretext' of arranging medical services." *Rodriguez*, 29 F.4th at 715. In other words, this Court concluded that plaintiffs' surviving claims are "based upon" alleged commercial activity because "with respect to the funds that constituted [PAHO's alleged] financial benefit," "PAHO had the role of financial 'intermediary.'" *Id.* The Court also concluded that the complaint adequately alleges that PAHO's supposed receipt of a financial benefit "occurred in the United States" by alleging that "PAHO received, forwarded[,] and retained the Mais Médicos money through its Washington, D.C. bank account." *Id.* at 716. Given plaintiffs' allegations regarding PAHO's supposed moving of money for a fee through U.S. bank accounts, this Court concluded, plaintiffs "sufficiently alleged that PAHO's conduct … constituted 'commercial activity carried on in the United States.'" *Id.* at 717. This Court did not address any other possible U.S. nexus, including based on where PAHO's headquarters, Director, or any other official was based when agreements governing Mais Médicos financial transactions were signed. *See id.*

---

[2] To be clear, plaintiffs' allegation on this point is *not* that the relevant agreements were executed in the United States (they were not), but rather that the PAHO official who approved them happens to be based in Washington. JA48-50.

In sum, the only jurisdictional theory that the district court or this Court has held to be plausible is that plaintiffs' surviving claims are based upon commercial activity carried on in the United States because plaintiffs alleged that PAHO moved money for fee between Cuba and Brazil using U.S. bank accounts.

>    **2.    The district court ordered jurisdictional discovery on a different theory: PAHO allegedly providing support for Mais Médicos from the United States**

As noted, the district court recognized in the challenged order that "[s]ince the original motion-to-dismiss proceedings, Plaintiffs have dreamt up several new theories of [a U.S.] nexus" for purposes of the commercial-activity exception. JA1238. The court nonetheless ordered responses to numerous discovery requests based on "new theories" of both nexus and commercial activity, granting several requests on the ground that they were "relevant to Plaintiffs' theory that the administration of [Mais Médicos] was carried on in D.C." JA1241-1243. That was error.

Start with interrogatory 1. There, plaintiffs demand that PAHO "[i]dentify" and "describe the[] role[s]" of "all people employed by or affiliated with PAHO who participated from the United States in the planning, implementation, management, and oversight of [Mais Médicos] operations and finances." JA1243. The challenged order appears to direct PAHO to respond fully to that interrogatory, deeming it "relevant to the carried-on theory," JA1243, i.e., the live theory that the alleged

movement of money "was carried on in the United States," JA1240. The information the interrogatory seeks, however, has nothing to do with the alleged use of U.S. bank accounts to move money. Rather, as plaintiffs themselves stated below in identifying their "Reason for Interrogatory No. 1," the information requested goes to plaintiffs' new, untested theory that "personnel in [PAHO's] Washington, D.C. headquarters were deeply and continuously involved in managing PAHO's role" in Mais Médicos. JA1225.

The district court made the same error with document request 8. That request seeks "[c]orrespondence and records concerning [an] independent administrative review" of Mais Médicos, "including all appendices and supporting documentation." JA1242-1243. The district court again seemingly ordered PAHO to produce all documents responsive to the request (without directly saying so), ruling that the documents sought "are relevant to the question of how the 5% fee was ultimately used (and specifically whether it was used to administer the program in any way)." JA1242. But how retained PSC payments were used is separate from both (1) whether receipt of PSC payments is commercial activity (i.e., constitutes receipt of a "fee") and (2) whether such payments (or other program-related reimbursements) were paid into a U.S. bank account. Again, then, the request (and the district court's order) are untethered to the only live jurisdictional theory.

As for document requests 1-3 and 7, as well as plaintiffs' deposition request, the district court deemed them "appropriate"—apparently in their entirety—because they are supposedly "relevant to [p]laintiffs' theory that the administration of the program was carried on in D.C." JA1241-1243. But again, plaintiffs' new U.S.-administration theory is not a proper basis for ordering discovery, as this Court never held that theory facially viable. *Supra* §II.A.

To be sure, portions of requests 1-3 and 7, as well as the deposition request, ask for information pertinent to the alleged movement of money for a fee using U.S. bank accounts. But putting aside for the moment that nothing in any of these requests satisfies *Nyambal*'s standard for jurisdictional discovery (as explained in §II.D), the district court did not order PAHO to respond to these requests *only* to the extent they bore on the live theory. It instead ordered them responded to in toto, including portions that unquestionably bear on plaintiffs' new theories rather than the live theory.

Similar errors pervade the rest of the challenged order:

- Request 6 seeks "[d]ocuments defining, or illustrating, the meaning" of four phrases that contain either "contracts" or "third-party services." JA1242. Without explaining what should be produced, the district court stated that "[t]hese documents are relevant to the extent that they use these terms in relation to payments or the movement of money," JA1242. But

legal definitions say nothing about whether money was moved using a U.S. bank account.

- Interrogatory 2 asks for "the total amount of money … that PAHO paid the Cuban government" during Mais Médicos. JA1243. But any "total amount" does nothing to establish or refute the use of a U.S. bank account. This interrogatory thus appears to ask for information relevant not to jurisdiction, but to potential damages, which is obviously improper at this stage.

- Plaintiffs seek to depose PAHO's former director of administration, who plaintiffs believe has "knowledge of all of PAHO's bank accounts and payments related to the Mais Médicos program." JA1243. But even setting aside that the deposition request refers to "Banco Citibank, S.A." rather than a U.S. bank, the request seeks information that is duplicative to the information PAHO already provided (*infra* §II.D).[3]

---

[3] Plaintiffs also requested discovery regarding any later transfers to the United States of money PAHO retained in connection with its support of Mais Médicos, on the theory that later such transfers could constitute a direct effect in the United States. JA1241 (request 1); *see also* JA1175. The district court correctly rejected that theory on the ground that plaintiffs identified no well-founded allegation that PAHO was required to transfer any retained payments to the United States, as necessary to satisfy the direct-effects test. JA1239-1240. Yet the court erred by failing to grapple with how its rejection of the direct-effects theory should have limited the scope of request 1 and plaintiffs' other requests. *See* JA1241-1243.

Put simply, the district court abused its discretion by committing the legal error of ordering a presumptively immune international organization to produce discovery that is untethered to the one jurisdictional theory under which it and this Court have held plaintiffs plausibly alleged jurisdiction. Because there has been no determination that jurisdiction would lie under plaintiffs' new U.S.-administration theory, the district court failed to heed this Court's instruction that discovery can be ordered "only" to the extent necessary to "verify allegations of specific facts crucial to an immunity determination," *Nyambal*, 772 F.3d at 281 (quotation marks omitted).

**C.     Even If Jurisdictional Discovery Could Be Ordered Under An Untested Theory, No Discovery Is Warranted On Plaintiffs' New Theory Of PAHO's Alleged Support For Mais Médicos From The United States Because That Theory Could Not Establish Jurisdiction**

The district court's order that PAHO submit to extensive discovery despite its presumptive immunity would be erroneous even if jurisdictional discovery could be ordered on theories not held sufficient to survive a facial motion to dismiss. That is because plaintiffs' new theory—that the commercial-activity exception is satisfied because PAHO provided support for Mais Médicos from the United States—fails as a matter of law, i.e., cannot create jurisdiction even if it is factually accurate.

Indeed, PAHO would have so argued, and the courts likely would have so held, had plaintiffs timely raised this theory. That of course underscores the impropriety of allowing jurisdiction on it now. "[A]rguments in favor of subject

matter jurisdiction can be waived by inattention or deliberate choice." *NetworkIP,*
*LLC v. Federal Communications Commission*, 548 F.3d 116, 120 (D.C. Cir. 2008).
The Court should not allow plaintiffs to benefit from their inattention or deliberate
choice in not raising this theory sooner.

In any event, the new theory fails as a matter of law because plaintiffs'
surviving claim is not "based upon" PAHO's administrative support for Mais
Médicos, 28 U.S.C. §1605(a)(2), and such conduct is in any event not commercial
activity for purposes of the IOIA.  Moreover, plaintiffs' discovery requests are based
on pure speculation rather than any need to verify specific facts alleged, as *Nyambal*
requires to order jurisdictional discovery.  Any of these flaws provides an
independent basis to reverse.

### 1. Plaintiffs' surviving claims are not "based upon" PAHO's administration of Mais Médicos

The district court held that evidence regarding PAHO's U.S.-based
administration of Mais Médicos is relevant to the U.S.-nexus prong of the
commercial-activity exception.  JA1240-1241.  But that exception applies only
where the conduct "carried on in the United States" is the conduct on which the
action is "based." 28 U.S.C. §1605(a)(2).  As discussed, plaintiffs' only remaining
claims are that PAHO received a financial benefit from its participation in Mais
Médicos.  The "gravamen" of those companion claims—i.e., what makes PAHO's
alleged conduct "wrongful" under plaintiffs' "theory of the case," *OBB*

*Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015)—is PAHO's alleged knowing

receipt of a financial benefit from human trafficking. JA29; *see also* JA30-31; JA43;

JA47-50. Accordingly, plaintiffs' claims are "based upon," 28 U.S.C. §1605(a)(2),

PAHO's receipt of a purported "fee" for moving money between Brazil and Cuba.

*See* JA25; JA82. Indeed, the complaint makes clear that plaintiffs' remaining claims

are not "based upon" PAHO's administrative support for or other substantive

participation in Mais Médicos, which underpins their new jurisdictional theory; the

complaint alleges that PAHO's other participation was instead a "pretext for being a

conduit of money to Cuba," JA47-48. No more is needed to conclude that even if

new theories can provide a basis for jurisdictional discovery, the district court erred

in ordering discovery on plaintiffs' new theory here.

> **2. PAHO's administration of Mais Médicos is not commercial activity**

Commercial activity under the IOIA is "the type of action[] by which a private

party engages in trade and traffic or commerce." *Republic of Argentina v. Weltover,

Inc.*, 504 U.S. 607, 614 (1992) (emphasis and quotation marks omitted). It is, in

other words, conduct carried on "in the manner of a private player within the

market." *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993) (quotation marks

omitted). Context is key in determining an activity's commercial (or non-

commercial) nature: Even a quintessentially commercial transaction (such as

lending money) can be non-commercial under the IOIA if not carried out in the way a private party would typically lend money. *Jam*, 586 U.S. at 214-215.

Consistent with these cases, this Court held in *Jungquist v. Sheik Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020 (D.C. Cir. 1997), that the management and administration of a "uniquely sovereign" public-health program is not commercial activity, *id.* at 1030. *Jungquist* considered claims against administrators of the Abu Dhabi foreign medical treatment program, based on their cessation of promised payments for medical care. *Id.* at 1024. This Court held the administrators immune under the FSIA because their alleged conduct—including arranging medical treatments, "processing … payments," and "making wire transfers"—constituted "official tasks as administrators of a government program to provide for the health and welfare of Abu Dhabi's citizens and residents," and were therefore not the kinds of actions "by which a private party engages in trade and traffic or commerce." *Id.* at 1030 (quotation marks omitted). Likewise here, PAHO's conduct of working with two Member States to carry out a national public-health program is not conduct in which private actors engage.

The Second Circuit reached a similar conclusion as *Jungquist* in *Anglo-Iberia Underwriting Management v. P.T. Jamsostek*, 600 F.3d 171 (2d Cir. 2010). There, the plaintiff alleged that Jamsostek, the Indonesian state-owned social security insurer, negligently supervised employees who carried out a fraudulent insurance

scheme. *Id.* at 174. The court held Jamsostek immune because, although supervising employees can be commercial activity, "the nature of Jamsostek's hiring, supervision, and employment … is directly concerned with employment in the provision of a governmental program of health benefits … and … such employment is by nature non-commercial." *Id.* at 178 (quotation marks omitted). Because Jamsostek was "Indonesia's default health insurer" and did "not sell insurance … in any traditional sense," it did not act as a private player in the market. *Id.* at 177 (quotation marks omitted). And because its provision of insurance was not commercial activity, neither was its administration of that program through hiring and supervising employees. *Id.* at 178. Again, the same conclusion is warranted here.

Indeed, as the United States explained in its amicus brief in this case, "a national or multinational public program undertaken by an international organization at the request of member states is not properly analogized to commercial service contracts"; rather, "an international organization's activity implementing a national or multinational public program at the request of its sovereign member states is a public act." U.S. Amicus Br.25. PAHO's administration of Mais Médicos—a national public-health program undertaken at the request of a Member State—is thus not commercial activity. That PAHO retained PSC payments to offset incurred overhead costs does not change that conclusion. Again, the United States explained

43

the point in its amicus brief, stating that "an international organization's receipt of program support costs from member states in support of a national or multinational public program is not commercial activity."  U.S. Amicus Br.17 (capitalization altered).  That conclusion is consistent with this Court's holding that the receipt of financial compensation does not turn non-commercial activity into commercial activity. *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 168 (D.C. Cir. 1994).

### 3.  Any administration of Mais Médicos by PAHO from the United States cannot satisfy the U.S.-nexus requirement

Yet another reason that plaintiffs' new theory could not justify jurisdictional discovery even if new claims are not categorically barred from doing so is that any U.S.-based administration of a program carried on abroad is not the kind of "substantial" U.S. contact needed to satisfy the U.S.-nexus requirement.  And expanding that requirement to encompass such routine U.S.-based administration would eviscerate the IOIA's protections, in contravention of congressional intent.

The commercial-activity exception's nexus requirement demands that the commercial activity on which a claim is based have "substantial contact with the United States."  28 U.S.C. §1603(e).  Here, the district court deemed that requirement sufficiently pleaded to support jurisdictional discovery based on its assertion that plaintiffs "alleged that the PAHO Director[] initiated the program from" Washington, D.C."  JA1240.  But even setting aside that the complaint contains no such allegation, *see infra* pp.46-47, the approval of an agreement or

management by officials based in Washington, D.C., would not be "substantial contact" with the United States, 28 U.S.C. §1603(e). Indeed, even the actual "execution of a contract in the United States is precisely the sort of incidental connection to the United States that does not satisfy the statute's 'substantial contact' requirement." *CapitalKeys, LLC v. Democratic Republic of Congo*, 2021 WL 2255362, at *16 (D.D.C. June 3, 2021) (K.B. Jackson, J.) (citing *Kettey v. Saudi Ministry of Education*, 53 F.Supp.3d 40, 50 (D.D.C. 2014)), *aff'd*, 2022 WL 2902083 (D.C. Cir. July 22, 2022). If actual execution in the United States is insufficient to create the required nexus, then, *a fortiori*, any approval to execute an agreement by a person who happens to be based in the United States would be insufficient as well.

And that makes sense, as holding that the requisite U.S. nexus exists because of where an official is based would expose the many international organizations headquartered in the United States to suit for conduct that was carried out entirely abroad and had no direct effect here, merely because officials serving here happened to authorize, manage, or administer an element of the activities abroad. Such a holding would undermine Congress's desire, in enacting the IOIA, that many "international organizations would locate their headquarters in the United States," *Jam*, 586 U.S. at 203. Such a holding would also render the U.S.-nexus requirement essentially meaningless.

**4.  Even if this theory were legally viable, discovery under it is not necessary to verify any specific factual allegation crucial to the immunity determination**

As this Court has explained, "unsupported speculation" about facts that *might* be uncovered in jurisdictional discovery cannot support discovery from a presumptively immune entity.  *Nyambal*, 772 F.3d at 283.  Rather, discovery is permissible only to the extent necessary to "'verify allegations of specific facts'" that are "'crucial to [the] immunity determination.'"  *Id.* at 281 (quoting *First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 176 (2d Cir. 1998)). The district court departed from this precedent here, where plaintiffs have not identified any such facts in need of verification.  The court reached a contrary conclusion by indulging two unsupported premises.

First, the court relied on its determination that plaintiffs alleged that PAHO's Director, who is based in Washington, "initiated the program from" the United States.  JA1240.  But that could not provide the requisite U.S. nexus because plaintiffs' claim is not "based upon" (28 U.S.C. 1605(a)(2)) any "initiat[ion of] the program."  In any event, there simply is no such allegation in the complaint.  The paragraphs on which the district court relied allege only that PAHO's Director "could and would" approve PAHO's participation in Mais Médicos, JA48-49, and that PAHO then entered into contracts with Brazil and Cuba, JA50.  And the evidence PAHO has provided conclusively shows that the agreements governing PAHO's

participation in Mais Médicos were all entered in Brasilia. *See, e.g.*, JA324. There is thus no basis for discovery regarding any U.S.-based program approvals, because such approval is not the basis of plaintiffs' remaining claims, was not alleged, and is nothing but unsupported (and, in fact, affirmatively refuted) speculation that any such U.S. approval occurred.

Second, the district court reasoned that plaintiffs "provided evidence that the [alleged] 5% fee was absorbed into PAHO's general budget, [at] which point it could have been used to support the administration of the program in the United States." JA1240-1241; *see also* JA1162-1163. But making funds available in the general budget is merely an accounting matter—it in no way equates to money being moved here—and as noted, the document on which plaintiffs and the district court relied specified that such funds were "distributed across the Organization," i.e., potentially to any of the dozens of countries in which PAHO has a presence. The notion that any PSC payments were actually transferred to the United States is thus "unsupported speculation," *Nyambal*, 772 F.3d at 283, as is the notion that any funds were used to support any U.S.-based administration of Mais Médicos. Speculation cannot justify the district court's discovery order.

**D.    *Nyambal*'s Standard For Ordering Jurisdictional Discovery From PAHO On The Sole Live Theory Is Not Met**

Any part of the challenged order that directed PAHO to produce discovery relating to plaintiffs' live jurisdictional theory is nonetheless infirm. For example,

the district court ordered PAHO to respond to requests that, in the court's view, were relevant to "showing the commercial nature of PAHO's activity," the "movement of money," and the "use of a U.S. bank to facilitate Mais Medicos." JA1242-1243 (regarding parts of document requests 4-6, 9, 10 and interrogatory 2). But the documents PAHO previously provided show that PAHO did not engage in the commercial activity of moving money for a fee and did not move money between Brazil and Cuba through any U.S. bank account. This evidence "obviate[s] the need for any further discovery," *Nyambal*, 772 F.3d at 282, i.e., means that nothing PAHO was ordered to produce regarding plaintiff's one live jurisdictional theory is "crucial to [the] immunity determination," *id.* at 281.

1. **The evidence already provided shows that PAHO did not engage in the commercial activity of "moving money for a fee"**

In its prior decision in this case, this Court described the key factual dispute regarding jurisdiction as "whether PAHO 'moved money for a fee' (i.e., acting as a financial intermediary) or, instead, arranged medical services for a fee (i.e., acting as an international public health organization)." *Rodriguez*, 29 F.4th at 715. That dispute had to be resolved in plaintiffs' favor at that juncture, this Court held, because "accepting all well-pleaded allegations as true," the complaint alleged "that PAHO 'moved money for a fee' under the 'pretext' of arranging medical services." *Id.* Under that holding, if the evidence shows that PAHO "act[ed] as an international

public health organization" by "arrang[ing] medical services," rather than simply "mov[ing] money for a fee," the commercial-activity exception would not apply. *Id.*

That is the situation: The evidence PAHO has "voluntar[ily] disclos[ed]," *Nyambal*, 772 F.3d at 282, shows that PAHO did not receive any fee in connection with Mais Médicos and did not move money under the pretext of providing medical services. There are thus no "allegations of specific facts crucial to [the] immunity determination" left to "verify," meaning the "need for … discovery" is "obviate[d]." *Id.* at 281-282. Indeed, despite PAHO making this point again and again, plaintiffs have never identified, in connection with the moving-money theory, *any* "specific facts crucial to [the] immunity determination" that *any* of the discovery they sought would supposedly "verify." *Id.* Nor did the district court. Discovery would therefore needlessly intrude upon PAHO's immunities and is barred under this Court's precedent.

### a. PAHO did not receive any "fee" in connection with Mais Médicos

The evidence already disclosed disproves the core premise of plaintiffs' jurisdictional theory, i.e., that PAHO was paid a "fee" for moving money between Brazil and Cuba in connection with Mais Médicos. The evidence PAHO has provided shows that the *only* funds PAHO received from Brazil and retained for itself in connection with Mais Médicos were PSC payments to cover a portion of the indirect costs PAHO incurred because of its participation in Mais Médicos. JA240;

JA245-246; JA655.  Whether PAHO's receipt of PSC payments (which for Mais Médicos were calculated at five percent of the projects direct expenses) constitutes commercial activity under the IOIA is, as plaintiffs have conceded, "a purely legal question" (involving "undisputed facts") that can be resolved with "[n]o further evidence."  Dkt.96 at 11, 16.

The answer to that legal question, moreover, is clear.  As the United States explained to this Court in this litigation, receipt of PSC payments "is public rather than commercial in nature."  *See* U.S. Amicus Br.17-18.  "To be 'commercial' within the FSIA's meaning," the United States elaborated, "'an activity must be "the *type*" of activity "by which a private party engages in" trade or commerce.'"  *Id.* at 5 (quoting *Jam*, 586 U.S. at 214).  The receipt of PSC payments is not such an activity.  *Id.* at 17, *quoted supra* pp.43-44.  Rather, PSC payments are part of international organizations' basic funding structures:  They are required because indirect costs— including the portions of general expenses like employee salaries, rent, energy costs, and computer services associated with a project, JA196—cannot be specifically identified.  And they are intended to prevent voluntary-contribution projects from "drawing upon funds that PAHO has budgeted or is obligated to use for other purposes," thereby "avoid[ing] the need to reallocate budgeted funds from the Organization's biennial budget to extrabudgetary programs" and "address[ing] the concern that Member States' quota assessments or other contributions will be used

to subsidize indirect and overhead expenses" associated with "a particular Member State's national program." JA197. Hence, just as a "sovereign's actions taken in connection with national programs that can only be established by a state"—such as voluntary-contribution projects—are public in nature, so too is "[a]n organization's receipt of payment for program support costs … in connection with the organization's implementation of such a program." U.S. Amicus Br.23-24. The district court was therefore wrong to order PAHO to produce program-related reports and an interrogatory response about the total program-related amounts paid to Cuba on the ground that that information is "relevant as targeted at showing the commercial nature of PAHO's activity." JA1243.

Indeed, neither plaintiffs nor the district court offered any reason why this evidence is "crucial to [the] immunity determination," *Nyambal*, 772 F.3d at 281. What plaintiffs argued below was that the requested documents and interrogatory response are necessary to show how much of Mais Médicos's total costs were paid to Cuba and thus the percent of PSC payments derived from those payments. JA1221-1222. That fails for two independent reasons.

First, the information PAHO "voluntar[ily] disclos[ed] … obviate[s]" any need for the requested discovery because that information fully provides what plaintiffs say the discovery would reveal. *Nyambal*, 772 F.3d at 282. Specifically, PAHO provided plaintiffs the agreements between PAHO and Brazil setting out the

total amounts paid by Brazil to PAHO, including for PSC, as well as bank statements showing those payments and all payments from PAHO to Cuba.  Dkt.80-4 at 24-287; JA646-656; JA688-746.  Plaintiffs thus already have access to documents sufficient to show the total amounts paid by Brazil and to Cuba.

Second, the total amount paid to Cuba has no bearing on the legal question of whether PAHO's receipt of PSC payments constitutes commercial activity.  Even if PAHO did nothing in connection with Mais Médicos besides coordinating the deployment and payment of Cuban medical personnel (i.e., even if all the PSC payments it retained were calculated based on payments to Cuba), PAHO's receipt of PSC payments would, as a matter of law, not be commercial activity, for the reasons discussed.  There is simply no connection between whether receiving PSC payments constitutes commercial activity and the percentage of an international organization's total PSC payments for a particular program that came from particular activities (or from payments to a particular recipient).

Plaintiffs also argued in the district court (Dkt.91 at 22) that they are entitled to financial records regarding the total indirect costs incurred in connection with Mais Médicos so that they can assess whether the retained PSC payments were actually to pay for such costs.  That argument misunderstands PSC.  As explained, *supra* p.8, PSC payments are not reimbursement for discrete identifiable costs but are charged to cover administrative costs that are incurred in connection with a

voluntary-contribution project yet cannot be specifically attributed to such a project. JA202. PSC payments thus ensure not that specific costs are recouped but that "funds of the [Organization's] Regular Budget … are not diverted to the detriment of [other] approved programs." JA213. In any event, plaintiffs' allegations provide no sound basis to conclude that retained PSC payments were used for any purpose other than to ensure that indirect costs associated with Mais Médicos did not cut into PAHO's general budget. Their argument is thus based on "unsupported speculation," *Nyambal*, 772 F.3d at 283, which cannot support jurisdictional discovery against a putatively immune entity.

> **b.** ***PAHO did not move money under a pretext of arranging medical services***

This Court's prior decision in this case suggested that if, as the complaint alleged, "PAHO 'moved money for a fee' under the 'pretext' of arranging medical services," that would constitute commercial activity. *Rodriguez*, 29 F.4th at 715. PAHO sworn declarations and other voluntarily provided documents, show that PAHO did no such thing. For example, a sworn declaration from the former Coordinator of the Health Systems and Services Technical Unit in PAHO's Brazil office details the myriad technical cooperation PAHO provided in connection with Mais Médicos. JA185-190. These activities included coordinating the training and mobilization of doctors to fill vacancies throughout Brazil, particularly in its most remote regions; monitoring and evaluating the quality of care provided through Mais

Médicos and the program's health-related impacts; and consulting the Brazilian government on how to train more Brazilian doctors to meet the country's needs, including helping identify where medical schools and residency programs should be established to ensure an adequate supply of doctors in underserved areas and helping design curricula for medical schools. *Id.* This evidence—which plaintiffs have no sound basis to question (and have not questioned)—confirms PAHO's role in providing technical cooperation, which included coordinating the delivery of medical services across Brazil.

> **2. The evidence already provided shows that any "moving of money" by PAHO between Brazil and Cuba in connection with Mais Médicos was not carried on in the United States**

This Court held that a sufficient U.S. nexus was alleged here because the complaint asserts that "PAHO received, forwarded and retained the *Mais Médicos* money through its Washington, D.C. bank account." *Rodriguez*, 29 F.4th at 716. As the evidence PAHO has provided shows, however, every step of the alleged commercial activity—the transfer of Brazil's voluntary contributions to PAHO, PAHO's transfer of money to Cuba to cover the direct costs associated with the deployment of Cuban physicians in Brazil, and PAHO's receipt of PSC payments— actually occurred in either Brazil or Cuba. The evidence thus shows that the purported movement of money was not "carried on in the United States," 28 U.S.C. §1605(a)(2), thereby "obviat[ing] the need for any further discovery," *Nyambal*, 772

F.3d at 282.  The district court accordingly abused its discretion in ordering PAHO to produce discovery "touching on the use of a U.S. bank to facilitate Mais Médicos." JA1242-1243; *see also id.* (granting document requests 4, 5, and 10).

More specifically, declarations and supporting bank statements PAHO provided demonstrate that Brazil deposited all Mais Médicos-related funds into PAHO's bank accounts in Brazil.  JA646-655; JA688-746.  The evidence likewise shows that PAHO paid program-related direct expenses out of those same accounts in Brazil or one account in Cuba.  JA242-243.  In particular, PAHO made all payments to Cuba for the services of its government-employed doctors from PAHO's account at Banco do Brasil to the Cuban Embassy's account at the same bank.  JA244; JA656; JA688-746.  PAHO also made payments from an account in Cuba to a Cuban entity that provided logistical, lodging, transportation, and other services in connection with trainings and other program-related meetings in Cuba. JA656-657.

PAHO's receipt and retention of PSC payments from Brazil also occurred entirely outside the United States.  Funds intended to cover PSC were included in Brazil's regular deposits into PAHO's Brazilian bank accounts.  JA245; *see also* Dkt.80-4 at 24-287.  PAHO then transferred accrued PSC from its account at Banco do Brasil (in Brazil) to its account at Banco Citibank S.A. (also in Brazil) on a periodic basis.  JA246.  None of this occurred in the United States.

Finally, the district court ordered PAHO to produce documents defining certain terms in PAHO's agreements with Brazil "to the extent they use these terms in relation to payments or the movement of money." JA1242. The court reasoned that such documents were "relevant" to plaintiffs' claims. *Id.* Mere "[r]elevance, however, is not enough" to justify discovery in this context. *Papandreou*, 139 F.3d at 253. Rather, discovery must be "crucial" to the immunity determination, in the sense of being necessary to "verify" a specific fact. Again, neither the court nor plaintiffs identified any reason why this evidence is "crucial to [the] immunity determination," *Nyambal*, 772 F.3d at 281.

Plaintiffs argued below, however, that this evidence was relevant to whether any of the initial funds transferred from Brazil to PAHO's Banco Citibank S.A. account were "used to pay Cuba for the services of Cuban doctors," which, in plaintiffs' view, would "provid[e] evidence of a domestic nexus." JA1211. That is meritless for two independent reasons (even putting aside that relevance is not enough). First, even if PAHO transferred money from its Banco Citibank S.A. account in Brazil to Cuba, that would not constitute commercial activity "carried on in the United States" because Banco Citibank S.A. is not located in the United States. Second, PAHO has provided evidence showing that all payments to Cuba were paid out of PAHO's Banco do Brasil account in Brazil and not its Banco Citibank S.A. account in Brazil. *See* JA241; JA244; JA656. In light of that evidence, plaintiffs

cannot make the required "well-founded allegation," *Nyambal*, 772 F.3d at 281, that any payments to Cuba were nonetheless paid from a Banco Citibank S.A. account in Brazil, much less that any banks in the United States were involved.

## CONCLUSION

The district court's jurisdictional-discovery order should be vacated.

April 30, 2025

Respectfully submitted,

*/s/ David W. Bowker*

David W. Bowker
Daniel S. Volchok
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
david.bowker@wilmerhale.com

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a) in that, according to the word-count feature of the word-processing system used to prepare this document (Microsoft Word), the motion contains 12,783 words, excluding the portions exempted by Rule 32(f).

*/s/ David W. Bowker*
David W. Bowker

**CERTIFICATE OF SERVICE**

On this 30th day of April, 2025, I filed the foregoing using the Court's CM/ECF system, which will send notice of the filing to all registered CM/ECF users.

*/s/ David W. Bowker*
David W. Bowker

# ADDENDUM

**ADDENDUM**
**TABLE OF CONTENTS**

Page

22 U.S.C. §288a ................................................................. Add.1

28 U.S.C. §1605 ................................................................ Add.2

# 22 U.S.C. §288a

## §288a. Privileges, exemptions, and immunities of international organizations

International organizations shall enjoy the status, immunities, exemptions, and privileges set forth in this section, as follows:

(a) International organizations shall, to the extent consistent with the instrument creating them, possess the capacity—

(i) to contract;

(ii) to acquire and dispose of real and personal property;

(iii) to institute legal proceedings.

(b) International organizations, their property and their assets, wherever located, and by whomsoever held, shall enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract.

(c) Property and assets of international organizations, wherever located and by whomsoever held, shall be immune from search, unless such immunity be expressly waived, and from confiscation. The archives of international organizations shall be inviolable.

(d) Insofar as concerns customs duties and internal-revenue taxes imposed upon or by reason of importation, and the procedures in connection therewith; the registration of foreign agents; and the treatment of official communications, the privileges, exemptions, and immunities to which international organizations shall be entitled shall be those accorded under similar circumstances to foreign governments.

## §1605. General exceptions to the jurisdictional immunity of a foreign state

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States;

(4) in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue;

(5) not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—

(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

(B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights; or

(6) in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if (A) the arbitration takes place or is intended to take place in the United States, (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards, (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or (D) paragraph (1) of this subsection is otherwise applicable.

(b) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of the foreign state, which maritime lien is based upon a commercial activity of the foreign state: *Provided*, That—

(1) notice of the suit is given by delivery of a copy of the summons and of the complaint to the person, or his agent, having possession of the vessel or cargo against which the maritime lien is asserted; and if the vessel or cargo is arrested pursuant to process obtained on behalf of the party bringing the suit, the service of process of arrest shall be deemed to constitute valid delivery of such notice, but the party bringing the suit shall be liable for any damages sustained by the foreign state as a result of the arrest if the party bringing the suit had actual or constructive knowledge that the vessel or cargo of a foreign state was involved; and

(2) notice to the foreign state of the commencement of suit as provided in section 1608 of this title is initiated within ten days either of the delivery of notice as provided in paragraph (1) of this subsection or, in the case of a party who was unaware that the vessel or cargo of a foreign state was involved, of the date such party determined the existence of the foreign state's interest.

(c) Whenever notice is delivered under subsection (b)(1), the suit to enforce a maritime lien shall thereafter proceed and shall be heard and determined according to the principles of law and rules of practice of suits in rem whenever it appears that, had the vessel been privately owned and possessed, a suit in rem might have been maintained. A decree against the foreign state may include costs of the suit and, if the decree is for a money judgment, interest as ordered by the court, except that the court may not award judgment against the foreign state in an amount greater than the value of the vessel or cargo upon which the maritime lien arose. Such value shall be determined as of the time notice is served under subsection (b)(1). Decrees shall be subject to appeal and revision as provided in other cases of admiralty and maritime jurisdiction. Nothing shall preclude the plaintiff in any proper case from seeking relief in personam in the same action brought to enforce a maritime lien as provided in this section.

(d) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any action brought to foreclose a preferred mortgage, as defined in section 31301 of title 46. Such action shall be brought, heard, and determined in accordance with the provisions of chapter 313 of title 46 and in accordance with the principles of law and rules of practice of suits in rem, whenever it appears that had the vessel been privately owned and possessed a suit in rem might have been maintained.

[(e), (f) Repealed. Pub. L. 110–181, div. A, title X, §1083(b)(1)(B), Jan. 28, 2008, 122 Stat. 341 .]

(g) LIMITATION ON DISCOVERY.—

(1) IN GENERAL.—(A) Subject to paragraph (2), if an action is filed that would otherwise be barred by section 1604, but for section 1605A or section 1605B, the court, upon request of the Attorney General, shall stay any request, demand, or order for discovery on the United States that the Attorney General certifies would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action, until such time as the Attorney General advises the court that such request, demand, or order will no longer so interfere.

(B) A stay under this paragraph shall be in effect during the 12-month period beginning on the date on which the court issues the order to stay discovery. The court shall renew the order to stay discovery for additional 12-month periods upon motion by the United States if the Attorney General

certifies that discovery would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action.

(2) SUNSET.—(A) Subject to subparagraph (B), no stay shall be granted or continued in effect under paragraph (1) after the date that is 10 years after the date on which the incident that gave rise to the cause of action occurred.

(B) After the period referred to in subparagraph (A), the court, upon request of the Attorney General, may stay any request, demand, or order for discovery on the United States that the court finds a substantial likelihood would—

(i) create a serious threat of death or serious bodily injury to any person;

(ii) adversely affect the ability of the United States to work in cooperation with foreign and international law enforcement agencies in investigating violations of United States law; or

(iii) obstruct the criminal case related to the incident that gave rise to the cause of action or undermine the potential for a conviction in such case.

(3) EVALUATION OF EVIDENCE.—The court's evaluation of any request for a stay under this subsection filed by the Attorney General shall be conducted ex parte and in camera.

(4) BAR ON MOTIONS TO DISMISS.—A stay of discovery under this subsection shall constitute a bar to the granting of a motion to dismiss under rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure.

(5) CONSTRUCTION.—Nothing in this subsection shall prevent the United States from seeking protective orders or asserting privileges ordinarily available to the United States.

(h) JURISDICTIONAL IMMUNITY FOR CERTAIN ART EXHIBITION ACTIVITIES.—

(1) In general.  -If-

(A) a work is imported into the United States from any foreign state pursuant to an agreement that provides for the temporary

exhibition or display of such work entered into between a foreign state that is the owner or custodian of such work and the United States or one or more cultural or educational institutions within the United States;

    (B) the President, or the President's designee, has determined, in accordance with subsection (a) of Public Law 89–259 (22 U.S.C. 2459(a)), that such work is of cultural significance and the temporary exhibition or display of such work is in the national interest; and

    (C) the notice thereof has been published in accordance with subsection (a) of Public Law 89–259 (22 U.S.C. 2459(a)),

any activity in the United States of such foreign state, or of any carrier, that is associated with the temporary exhibition or display of such work shall not be considered to be commercial activity by such foreign state for purposes of subsection (a)(3).

    (2) EXCEPTIONS.—

    (A) NAZI-ERA CLAIMS.—Paragraph (1) shall not apply in any case asserting jurisdiction under subsection (a)(3) in which rights in property taken in violation of international law are in issue within the meaning of that subsection and-

        (i) the property at issue is the work described in paragraph (1);

        (ii) the action is based upon a claim that such work was taken in connection with the acts of a covered government during the covered period;

        (iii) the court determines that the activity associated with the exhibition or display is commercial activity, as that term is defined in section 1603(d); and

        (iv) a determination under clause (iii) is necessary for the court to exercise jurisdiction over the foreign state under subsection (a)(3).

    (B) OTHER CULTURALLY SIGNIFICANT WORKS.—In addition to cases exempted under subparagraph (A), paragraph (1) shall not apply

in any case asserting jurisdiction under subsection (a)(3) in which rights in property taken in violation of international law are in issue within the meaning of that subsection and-

       (i) the property at issue is the work described in paragraph (1);

       (ii) the action is based upon a claim that such work was taken in connection with the acts of a foreign government as part of a systematic campaign of coercive confiscation or misappropriation of works from members of a targeted and vulnerable group;

       (iii) the taking occurred after 1900;

       (iv) the court determines that the activity associated with the exhibition or display is commercial activity, as that term is defined in section 1603(d); and

       (v) a determination under clause (iv) is necessary for the court to exercise jurisdiction over the foreign state under subsection (a)(3).

(3) DEFINITIONS.—For purposes of this subsection-

(A) the term "work" means a work of art or other object of cultural significance;

(B) the term "covered government" means—

       (i) the Government of Germany during the covered period;

       (ii) any government in any area in Europe that was occupied by the military forces of the Government of Germany during the covered period;

       (iii) any government in Europe that was established with the assistance or cooperation of the Government of Germany during the covered period; and

       (iv) any government in Europe that was an ally of the Government of Germany during the covered period; and

(C) the term "covered period" means the period beginning on January 30, 1933, and ending on May 8, 1945.